**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
ST. THOMAS/ST. JOHN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL ACTION** |
| | **:** | |
| **v.** | **:** | **NO. 3:25-1** |
| | **:** | |
| **RAY MARTINEZ, JENNIFER O'NEAL** | **:** | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                              **May 28, 2026**

As always, the rule of law applies to everyone regardless of their temporary power and influence. Being governed by the People, including through a jury of fair-minded residents, requires all of us to answer charges brought by an independent grand jury. And our process due to a charged person allows them to defend at a full and fair trial before twelve unbiased residents sitting as the judges of the facts and guided by the law provided by the judge. This time-tested bedrock principle applied six months ago to two former senior members of the Virgin Islands Government. Our Grand Jury charged former Virgin Islands Police Department Commissioner Ray Martinez with honest services wire fraud, bribery concerning programs receiving federal funds, money laundering conspiracy, obstruction of justice by corrupt persuasion, and obstruction of justice by falsification of records. Our Grand Jury also charged former Virgin Islands Office of Management and Budget Director Jenifer O'Neal with honest services wire fraud, bribery concerning programs receiving federal funds, and money laundering conspiracy. The United States adduced evidence, Ray Martinez adduced evidence, and the parties vigorously disputed the import of the substantial evidence. The jury, after extensive deliberation, unanimously found each former senior government official guilty as charged.

These two former senior government officials now ask us to set aside the unanimous verdict from a twelve person jury who heard all the evidence. They repeat arguments they made to the

jury. The adduced evidence overwhelmingly confirmed the officials' disregard for the rule of law. We decline to set aside the jury's considered verdicts.

## I.      Evidence adduced at trial

The evidence confirms personal relationships between and among a convicted fraudster and two senior Virgin Islands government officials leading to the residents of the Virgin Islands being deprived of the loyalty and diligence we expect from those whom we temporarily delegate some measure of power. The facts are a powerful deterrence to arrogance.

### The Virgin Islands Police Department and Mon Ethos begin working together in 2022.

Admitted federal felon and widely-known fraudster David Whitaker came to the Virgin Islands after years of businesses on the mainland. He formed, owned, and operated Mon Ethos Pro Support, a digital solutions company, and began engendering the trust of government officials who hired his company to work as a government contractor for the Virgin Islands.[1]

Mr. Whitaker met former Police Commissioner Martinez through mutual friends in 2022 and they developed both a working relationship and valued personal friendship.[2] Mr. Whitaker told Commissioner Martinez about his digital-forensics work and the services his company performed.[3] Mon Ethos began providing services to the Virgin Islands Police Department in 2022.[4] Mon Ethos did not then have a contract with the Police Department—the Police Department would request Mon Ethos's services, Mon Ethos would perform the work, and Mon Ethos would then submit invoices for payment.[5] Mr. Whitaker swore he sent "the majority of the invoices, at least the lion share of them," directly to Commissioner Martinez.[6] The invoices required approval from Commissioner Martinez before moving through the payment process and ultimately being paid by check, wire transfer, or electronic bank-to-bank transfer.[7] Mon Ethos maintained its bank account at First Bank.[8]

Mon Ethos submitted invoices to Commissioner Martinez at the Police Department dated July 30, August 31, and September 30, 2022.[9] The Police Department did not pay the Mon Ethos invoices for several months leading Mr. Whitaker to become "pretty desperate to be paid" in November 2022.[10] He spoke with Commissioner Martinez at Commissioner Martinez's restaurant then under construction and Commissioner Martinez told him "he needed to work on his restaurant and didn't have time to go to work" to address the invoices.[11] Mr. Whitaker swore he offered to help with Commissioner Martinez's restaurant "by providing him with payment or things of value to help the restaurant in exchange for" Commissioner Martinez getting Mon Ethos's invoices paid.[12] Mr. Whitaker swore he purchased equipment and supplies for the restaurant so Commissioner Martinez "would stop working on his restaurant during work hours and go pay [Mon Ethos's] invoice."[13] The jury reviewed corroborative evidence of a Mon Ethos bank statement showing a $3,620 debit to KLR Services, a kitchen supply company, on November 28, 2022.[14]

Commissioner Martinez sent a justification letter on November 29, 2022 relating to Mon Ethos invoices to the Commissioner of Property and Procurement, who approved it on December 8, 2022.[15] A December 2022 Mon Ethos bank statement showed another $1,443 debit to KLR Services for supplies for Commissioner Martinez's restaurant.[16] The Government of the Virgin Islands sent Mon Ethos a $20,018.10 electronic payment on December 28, 2022 which Mr. Whitaker received while in the Virgin Islands.[17] Mon Ethos continued providing services to the Police Department and submitting invoices to Commissioner Martinez into 2023.[18] Mr. Whitaker swore he continued providing money and purchasing restaurant supplies for Commissioner Martinez's restaurant during this period.[19]

3

***Mr. Whitaker and Commissioner Martinez sign the "Steak Out" agreement and Mr. Whitaker continue providing benefits to Commissioner Martinez in 2023.***

Mr. Whitaker swore he eventually became concerned about the arrangement "being bribery" because he provided payments for Commissioner Martinez's restaurant while Commissioner Martinez served as a government official.[20] Mr. Whitaker proposed the "Steak Out" agreement as a "pass through" for future payments to Commissioner Martinez.[21] He described it as a "fake out agreement of what was actually going on."[22] Mr. Whitaker swore his lawyer drafted the document but he did not tell his lawyer he "had been bribing [Commissioner] Martinez" or "wanted . . . a cover-up document."[23] Mr. Whitaker instead told his lawyer "what [his lawyer] needed to hear to write the document" and his lawyer drafted the document based on Mr. Whitaker's instructions about the agreement he claimed to be entering with Commissioner Martinez.[24] Mr. Whitaker and Commissioner Martinez signed the Steak Out agreement on April 1, 2023.[25]

Commissioner Martinez's counsel cross-examined Mr. Whitaker about the Steak Out agreement as a stated explanation for the restaurant-related payments. Mr. Whitaker swore Steak Out involved an online show where police officers would discuss cases and cook—Commissioner Martinez would appear in the show and Mr. Whitaker would handle media production.[26] The agreement acknowledged the ongoing business relationship between Mon Ethos and the Police Department and sought to provide clarity and transparency in the joint venture.[27]

Mr. Whitaker continued paying restaurant-related expenses after he and Commissioner Martinez signed the Steak Out agreement.[28] An April 2023 Mon Ethos bank statement showed an outgoing $6,693 wire to a construction company working on Commissioner Martinez's restaurant.[29] Mr. Whitaker swore he sent money to the construction company because Commissioner Martinez asked him to do so and because he had agreed to make payments for

Commissioner Martinez in exchange for getting Mon Ethos's invoices paid.[30] Additional bank records from April and May 2023 showed $941.01 and $3,637.55 wire transfers to Commissioner Martinez's wife for supplies or reimbursements related to the restaurant and $4,341 and $10,547 wire transfers to the construction company.[31]

Mr. Whitaker and Commissioner Martinez began traveling together to Boston in May 2023 and returned for later trips. They flew "a luxury level of first class" and stayed in a two-bedroom penthouse-style suite with a butler.[32] Mr. Whitaker swore he withdrew $7,500 in cash for gambling and out-of-pocket expenses for himself and Commissioner Martinez on the first trip.[33] The United States introduced thousands of dollars of hotel, game, restaurant, and travel expenses relating to the Boston trips.[34]

The jury also heard the defense explanation for the Boston travel. Mr. Whitaker acknowledged Commissioner Martinez had been hospitalized in St. Thomas with a brain tumor, and Mr. Whitaker came to the hospital.[35] Mr. Whitaker helped Commissioner Martinez obtain a neurosurgeon in Boston, set up medical appointments, accompanied Commissioner Martinez to appointments, and remained with him during brain surgery.[36] Mr. Whitaker and Commissioner Martinez traveled together for the surgery, stayed in Boston for a few days afterward, and later returned for follow-up care.[37]

### *The Police Department and Mon Ethos enter a federally funded contract.*

Mon Ethos continued assisting the Police Department in investigations throughout 2023 and the Police Department moved to formalize this relationship through a contract.[38] The Department of Property and Procurement, which administers and enforces procurement rules and handles acquisition and purchasing of goods and services for the Virgin Islands government, advised the Police Department it would not continue approving payments to Mon Ethos outside a contract because Mon Ethos's services had become recurring.[39] Lisa Alejandro, Commissioner of

Property and Procurement, explained an agency may submit a justification letter to Property and Procurement requesting approval to move forward with a contract when the ordinary procurement process has not been followed.[40] After Property and Procurement approves a justification letter, the agency prepares the formal submission, including the contract, supporting documents, funding sources, and registration documents.[41] Contracts over one million dollars require Department of Justice review and final signature by the Governor.[42]

Mr. Whitaker swore he and Commissioner Martinez discussed pursuing "an actual larger contract" with Mon Ethos and Commissioner Martinez told him they should make it $1.4 million instead of $5 million so it would "go through easier."[43] Commissioner Martinez authored and signed a justification letter requesting sole-source selection in favor of Mon Ethos and authorizing funding of $1,489,683.[44] The parties set the final contract's maximum value at $1,489,683 funded by the American Rescue Plan Act of 2021.[45]

Mr. Whitaker swore the negotiation and signing process took months and involved the Police Department, Property and Procurement, the Attorney General's Office, and the Governor's Office.[46] Mon Ethos employee Anthony Thomas also assisted with the contract process.[47] Mr. Whitaker signed the contract on July 28, 2023; Commissioner Martinez signed it on August 1, 2023; Commissioner Alejandro and the Department of Justice signed it on September 7, 2023; and Governor Bryan signed it on October 10, 2023.[48] The related grant and sub-grant documents identified the United States Department of Treasury and the American Rescue Plan Act as the federal funding source and bore Director O'Neal's signature as grantee and Commissioner Martinez's signature as sub-grantee.[49] Commissioner Alejandro swore she would not have signed the contract "if [she] knew another person who signed [the] contract . . . had been paid to approve the contract" because "it's against all federal and local laws."[50]

6

Mr. Whitaker continued providing benefits to Commissioner Martinez while the contract moved through the approval process. A June 2023 Mon Ethos bank statement showed additional debits to the kitchen supply store for Commissioner Martinez's restaurant.[51] An August 2023 Mon Ethos bank statement showed an $11,500 wire transfer to Commissioner Martinez's wife for rent and deposit on a new house.[52] Mr. Whitaker and Commissioner Martinez also returned to Boston in August 2023.[53] A September 2023 Mon Ethos bank statement showed a $4,295.13 payment for a grill eventually delivered to Commissioner Martinez's home.[54] Mr. Whitaker also began cooperating with the Federal Bureau of Investigations in September 2023.[55]

### *The Virgin Islands paid substantial sums to Mon Ethos after the contract.*

Mr. Whitaker swore the Virgin Islands paid Mon Ethos shortly after Governor Bryan signed the contract in October 2023.[56] Mr. Whitaker explained after invoice submission and commissioner sign-off, federally funded items would go to Office of Management and Budget and the purchase order would generate the check or electronic payment.[57] In an October 15, 2023 recorded call, Commissioner Martinez told Mr. Whitaker "Jason can approve it" which Mr. Whitaker understood to mean Police Department Deputy Commissioner Jason Marsh could approve a Mon Ethos invoice for payment.[58] Mr. Whitaker also understood their discussion of something being "fast-tracked" to refer to payment on the invoice.[59] The call also referenced the grill Mr. Whitaker purchased for Commissioner Martinez and additional restaurant equipment Mr. Whitaker would pay for.[60] Additional recorded calls between Commissioner Martinez and Mr. Whitaker in October 2023 referenced Mr. Whitaker paying tuition for Commissioner Martinez's children and delivery of the grill to his house.[61] An October 2023 Mon Ethos bank statement showed an incoming payment of $372,420.75 from the Government of the Virgin Islands.[62] Mr. Whitaker swore this

payment related to work Mon Ethos performed after the contract and he used the payment to pay Mon Ethos bills and Commissioner Martinez.[63]

Deputy Commissioner Marsh also testified about the October 2023 contract payment.[64] He received a Mon Ethos invoice from Police Department Chief Financial Officer Sandra Webster and signed it as acting commissioner.[65] Deputy Commissioner Marsh reviewed the invoice submitted to the Police Department and confirmed it related to a $372,420.75 contract payment to Mon Ethos which he approved on October 16, 2023.[66] Deputy Commissioner Marsh swore on cross-examination he did not receive specific instructions from Commissioner Martinez in October 2023 directing him to approve invoices.[67]

Mon Ethos submitted an October 29, 2023 invoice to Commissioner Martinez totaling $325,912.[68] Commissioner Martinez and Mr. Whitaker later discussed resubmitting an invoice and "add[ing] a little to it" in a November 3, 2023 recorded call and Mr. Whitaker swore he did resubmit the invoice.[69] Mr. Whitaker swore the original invoice amount had been approximately $20,000 or $40,000 less.[70] In a separate November 3, 2023 recorded call, Mr. Whitaker, Commissioner Martinez, and Director O'Neal discussed Director O'Neal's plan to open a coffee shop.[71] Director O'Neal said Mr. Whitaker "was supposed to [tell her] his 'rate'" and Mr. Whitaker understood Director O'Neal to be asking what Yacht Haven Grande charged him per square foot because she sought coffee-shop space in the same location as Mon Ethos's office.[72] In a November 21, 2023 recorded call, Commissioner Martinez said "[w]e added stuff to it" which Mr. Whitaker swore referred to "add[ing] additional things under the invoice, a slush fund to pay . . . for things with."[73] Commissioner Martinez also said "I'll keep pushing it" and Mr. Whitaker understood this to refer to payment of the invoice.[74] The invoice received approval on November 29, 2023.[75] A

8

December 2023 Mon Ethos bank statement showed Mon Ethos received a $325,912 payment from the Government of the Virgin Islands which Mr. Whitaker received while in the Virgin Islands.[76]

Mr. Whitaker swore another Boston trip with Commissioner Martinez occurred during this period. The United States introduced a $25,516 hotel bill, which Mr. Whitaker swore he paid for, and a Mon Ethos bank statement showing airplane tickets for the trip costing $2,300 each.[77] Commissioner Martinez and Mr. Whitaker discussed sending $4,100 for Commissioner Martinez's children's tuition in a December 2023 recorded call and text messages showed Commissioner Martinez asking whether the school payment covered December or January tuition.[78] A Mon Ethos wire transfer receipt showed $4,100 sent to Commissioner Martinez's wife for the children's tuition.[79]

### *Mon Ethos billed the Virgin Islands for a $70,000 line item solely to satisfy Commissioner Martinez's and Director O'Neal's personal wishes.*

Commissioner Martinez continued working to open his restaurant and continued asking Mr. Whitaker for payments in early 2024.[80] He and Mr. Whitaker discussed a list of restaurant equipment needed for the restaurant in a January 1, 2024 recorded call.[81] Mr. Whitaker said they could "just increase the amount of the invoice" and Commissioner Martinez agreed.[82] Mr. Whitaker swore Commissioner Martinez "eventually ask[ed him] for money for" the equipment.[83] Commissioner Martinez referenced their discussion about increasing the "invoice so that [they] could order the equipment" in a second recorded call the same day.[84] He said "let's go ahead and increase it" and told Mr. Whitaker he would put the invoice through the next day.[85] Mr. Whitaker asked how much he should put on the invoice and Commissioner Martinez said the "stuff" he sent Mr. Whitaker "was seventy-some thousand" which "would bring it at about 210."[86] Mr. Whitaker swore Commissioner Martinez asked him to add a $70,000 line item to a December Mon Ethos

9

invoice ready to be submitted to the Police Department to pay Commissioner Martinez's restaurant expenses, bringing the invoice to $210,000.[87]

Commissioner Martinez then discussed whether "there was a way for [them] . . . maybe with the January payment . . . to add something for" Director O'Neal in a recorded January 11, 2024 meeting.[88] He suggested "maybe a ten or fifteen thousand [unintelligible] gifted to her . . . if [they] had a way to get it" and "maybe cash."[89] Mr. Whitaker swore he understood Commissioner Martinez to be asking him to put another line item on a Mon Ethos invoice for Director O'Neal.[90] Mr. Whitaker met with Director O'Neal on January 14, 2024 and recorded the meeting.[91] Mr. Whitaker told Director O'Neal Commissioner Martinez had directed him to speak with her.[92] He explained Commissioner Martinez "talked to [him] about making sure [they] had fifteen grand extra for [her]" and Commissioner Martinez "started off with fifteen grand and now it's seventy."[93] Mr. Whitaker swore this meant Commissioner Martinez initially asked him to put $15,000 on an invoice line item and later wanted him to increase the line item to $70,000.[94] Mr. Whitaker told Director O'Neal he wanted to know the amount she needed so they could "take care of it and not have to do it so many times" because "[o]therwise it just takes so long" and she responded, "Exactly," and "I'm ready to work."[95] Mr. Whitaker and Director O'Neal later discussed start-up costs for Director O'Neal's coffee shop. Director O'Neal said "[w]e still need to pay the 17. That's the down-payment," which Mr. Whitaker understood to mean the lease down payment for her coffee shop.[96] Mr. Whitaker again explained Commissioner Martinez had told him to "put fifteen on there for [her]" and Director O'Neal responded "15 is for the down payment."[97] Mr. Whitaker also told Director O'Neal Commissioner Martinez "was telling [him] to put an additional fifteen on his stuff to give [Director O'Neal] fifteen cash" and he told Commissioner Martinez he did not "think that's enough."[98] Director O'Neal responded "it might be enough."[99]

The United States introduced a January 20, 2024 text exchange between Mr. Whitaker and Director O'Neal.[100] Mr. Whitaker's text asked whether the Police Department "invoice for $216k has processed" and referenced the additional $70,000 line item.[101] Director O'Neal replied "lol" and then said she would check with her staff concerning the invoice.[102] Jamie Gaston, the federal grants manager at the Office of Management and Budget, swore Director O'Neal messaged her on January 20, 2024 directing her to make sure American Rescue Plan Act-related invoices were processed and entered onto the priority payment list so the Department of Finance could pay them in the next payment cycle.[103] Director O'Neal's message stated she wanted "to keep [her] word" and "say with certainty" the American Rescue Plan Act programs were completed with "no [American Rescue Plan Act] invoices sitting."[104] Ms. Gaston swore Mon Ethos had invoices pending at the time, which would have been included in the next payment cycle, and she followed up because Director O'Neal's message "was a directive."[105]

Mr. Whitaker and Commissioner Martinez also discussed the invoice in a recorded call on January 20, 2024.[106] Mr. Whitaker told Commissioner Martinez "it says 'pending now in the system'" and swore "it" referred to the invoice.[107] Mr. Whitaker then referenced "70" which he swore meant the $70,000 placed on the invoice as an additional line item for Commissioner Martinez and Director O'Neal.[108] Commissioner Martinez also referenced "ARPA" which Mr. Whitaker understood to mean the federal funds being used to pay the Mon Ethos contract.[109] A Mon Ethos January 2024 bank statement showed a $216,100 payment to Mon Ethos which Mr. Whitaker received while in the Virgin Islands.[110]

### *Mr. Whitaker used the $70,000 invoice proceeds for Commissioner Martinez's and Director O'Neal's expenses.*

Commissioner Martinez and Mr. Whitaker again discussed the "70 grand" in a January 30, 2024 recorded call and Mr. Whitaker swore Commissioner Martinez asked him to pay his

children's tuition with some of the proceeds.[111] A February 2024 Mon Ethos bank statement showed a $4,100 debit which Mr. Whitaker swore he sent to Commissioner Martinez's wife for the children's tuition.[112] Mr. Whitaker and Director O'Neal discussed "R.H. stuff" in a February 10, 2024 recorded call which Mr. Whitaker swore referred to furniture Director O'Neal wanted for her coffee shop.[113] Mr. Whitaker also told Director O'Neal he and Commissioner Martinez "put that seventy grand on that invoice to get [Commissioner Martinez] the money to order the equipment" and Commissioner Martinez "pushed [him]" to do so to get the money paid.[114] Mr. Whitaker and Commissioner Martinez discussed a vent hood for Commissioner Martinez's restaurant in a recorded meeting in March 2024 and Mr. Whitaker swore he bought "out of the $70,000."[115] A restaurant store invoice and wire confirmation showed Mon Ethos paid $12,515 for the vent hood, with the wire information stating "Payment for Ray Martinez."[116]

Mr. Whitaker, Commissioner Martinez, and Director O'Neal met in a recorded meeting on April 6, 2024.[117] Mr. Whitaker swore he brought papers and a bank statement showing the $70,000 and a list of equipment being bought for Commissioner Martinez's restaurant and Director O'Neal's coffee shop.[118] Mr. Whitaker asked Director O'Neal when she needed to sign the lease for her coffee shop and she responded "next week."[119] Mr. Whitaker then asked whether they should "take twenty out of this."[120] Director O'Neal responded "it's seventeen" and Commissioner Martinez said "take twenty out of this for her lease."[121] Mr. Whitaker swore "this" referred to the $70,000 "slush fund from the added invoice line item and "it" referred to Director O'Neal's lease payment for her coffee shop.[122] Commissioner Martinez then explained "it was seventy, took out a twelve, so that took it down to fifty-some odd."[123] Mr. Whitaker then asked whether Director O'Neal wanted the lease payment wired to the business.[124] Director O'Neal responded "I guess" and explained "I don't like traces of anything" and "[w]ire means it's traced."[125] Mr. Whitaker then

12

asked for the easiest way to make the payment "so it's not traceable."[126] Mr. Whitaker swore he opened a separate account after the April 6 meeting and moved the "slush fund" into it "from the normal Mon Ethos account."[127]

Mr. Whitaker texted Director O'Neal on April 8, 2024 and asked how much was needed for "Charley," whom Mr. Whitaker identified as the manager of Yacht Haven Grande, and Director O'Neal responded "17,730."[128] Mr. Whitaker swore he made the payment on Director O'Neal's behalf from the slush-fund checking account.[129] An April 15, 2024 Mon Ethos wire confirmation showed a $17,730 payment to Yacht Haven Grande with additional recipient information stating "Payment for Jenifer O'Neal for Yacht Haven Grande, required lease deposits, and payments by David Whitaker."[130] Mr. Whitaker swore he made the payment while he remained in the Virgin Islands.[131] General Manager of Yacht Haven Grande Charles Irons swore Director O'Neal served as the tenant or responsible party for Java Grande, her coffee shop, in April 2024.[132] He confirmed Java Grande owed a deposit as a new tenant and identified the April 15, 2024 wire confirmation showing a $17,730 payment to Yacht Haven Grande for Java Grande's initial lease obligations paid by Mr. Whitaker.[133] Yacht Haven Grande applied the payment to Java Grande's account.[134]

Director O'Neal's counsel asked Mr. Whitaker if he told Director O'Neal the money for the lease deposit came from Commissioner Martinez and Mr. Whitaker agreed he did.[135] Mr. Whitaker also agreed "[a]t no time did [he] say . . . it's not coming from [Commissioner] Martinez. It's coming from elsewhere."[136] Mr. Whitaker swore he told Director O'Neal about the criminal nature of the conduct "on the whole process along the way" and they "talked about hiding funds" and "how to move money."[137] He further swore he told Director O'Neal he, Commissioner Martinez, and Director O'Neal "want[ed] to steal money from the Government of the Virgin Islands."[138]

13

***First Bank processed wire transfers through servers in Puerto Rico.***

First Bank's Senior Vice President for Technology and Operations Miguel Mejis Moya swore First Bank processes wire transfers through its data center and Global Funds Transfer server in San Juan, Puerto Rico.[139] He explained First Bank has no servers in the Virgin Islands and confirmed any wire transfer received through First Bank in the Virgin Islands must pass through First Bank servers in San Juan.[140] Mr. Mejis Moya reviewed the April 15, 2024 wire confirmation for the $17,730 Yacht Haven Grande payment and swore it processed through First Bank's data center and Global Funds Transfer server in Puerto Rico.[141]

***Commissioner Martinez discussed destroying devices and creating a promissory note after learning of the federal investigation.***

Mr. Whitaker swore in June 2024 Commissioner Martinez told him the Bureau seized his phone.[142] Commissioner Martinez told Mr. Whitaker in a June 13, 2024 recorded call to "burn the phone," which Mr. Whitaker understood to mean getting rid of his phone.[143] Mr. Whitaker also interpreted Commissioner Martinez's statements as instructions to destroy his Android phone, get an iPhone, and destroy his computer.[144] Mr. Whitaker swore Commissioner Martinez also "created a new email address so that [Mr. Whitaker] could send things to him and not to his old email address so he could cover up . . . emails."[145] Commissioner Martinez instructed Mr. Whitaker to "get rid of this one" in a June 18, 2024 recorded call which Mr. Whitaker understood to mean the phone Mr. Whitaker used for the call.[146]

Jasmine Blyden swore Commissioner Martinez called her on June 13, 2024 to ask if he could stop by and then went to her home in St. Thomas.[147] Commissioner Martinez asked to use Ms. Blyden's laptop and she allowed him to use it at her dining room table while she remained in the kitchen.[148] She estimated Commissioner Martinez used the laptop for about fifteen to twenty minutes and did not tell her what he did on it.[149] Ms. Blyden did not see Commissioner Martinez

print documents, save work to a jump drive or CD, type on the computer, use a browser, or send an email.[150] She swore Commissioner Martinez could not have printed anything from her laptop because her laptop could not communicate with her printer.[151] Ms. Blyden searched her laptop after Commissioner Martinez left "to see if he did anything on it" but did not locate any document or file related to what he had done.[152]

The United States introduced a June 20, 2024 recorded call in which Commissioner Martinez read a promissory note to Mr. Whitaker.[153] The note described a $10,500 loan for Commissioner Martinez's personal home to be repaid in monthly payments beginning ninety days after Commissioner Martinez's restaurant opened.[154] It also described a $16,400 loan for four months of tuition assistance for Commissioner Martinez's children, also to be repaid in monthly payments beginning ninety days after the restaurant opened.[155] Commissioner Martinez said only he needed to sign the promissory note and explained he would "be able to give [Mr. Whitaker] a copy."[156] Commissioner Martinez also said if Mr. Whitaker faced questioning, the explanation would be Mr. Whitaker helped him as a friend because he had "financial strains" and the payments were not "a gift just given to [him] or anything like that." Mr. Whitaker swore the promissory note did not reflect a real agreement with Commissioner Martinez.[157] The United States also introduced a signed copy of the promissory note dated August 15, 2023.[158] Special Agent Kiernan Whitworth swore Commissioner Martinez made no payments toward these expenses, and the investigation did not reveal any attempts to repay them.[159]

Mr. Whitaker asked Commissioner Martinez in the same recorded call whether anything had been in writing when he first came to the restaurant and said "if you can help me get paid[,] I'll help you with this" before they "talked to Joe."[160] Commissioner Martinez responded, "hell no. Nothing in writing about that."[161] Mr. Whitaker swore the "agreement with Joe" referred to the

15

Steak Out agreement.[162] Mr. Whitaker also swore Commissioner Martinez instructed him to spend remaining funds from the $70,000 but he did not do so because the Bureau told him not to.[163]

### *Mr. Whitaker admitted his convictions and cooperation agreement.*

The jury also heard extensive impeachment of Mr. Whitaker. Mr. Whitaker admitted he had multiple felony convictions involving fraud, deceit, lies, and stealing.[164] He swore he previously pleaded guilty to a 2008 wire-fraud scheme, received a sentence of over five years, and received a lower sentence because he cooperated with the Bureau in a separate case.[165] Mr. Whitaker also swore he recently pleaded guilty in the Virgin Islands to two counts of wire fraud and one count of bribery concerning programs receiving federal funds.[166] He swore those charges involved falsely claiming he discovered cameras in government buildings and billing for such activity, making false statements on a federal loan application, and engaging in a bribery scheme with Commissioner Martinez.[167] Mr. Whitaker further swore he agreed to cooperate with the United States and work covertly under the Bureau's supervision, pleaded guilty under the agreement with the United States, and awaits sentencing.[168] He swore he agreed to cooperate in this case because he wanted to potentially reduce his sentence and believed his cooperation might benefit him.[169]

## II.    Analysis

Commissioner Martinez and Director O'Neal move for acquittal or a new trial under Federal Rules of Criminal Procedure 29 and 33.[170] Commissioner Martinez challenges the sufficiency of the evidence supporting the honest services wire fraud, federal program bribery, money laundering, and obstruction convictions.[171] Director O'Neal challenges the sufficiency of the evidence supporting her honest services wire fraud, federal program bribery, and money laundering conspiracy convictions, and alternatively seeks a new trial based on alleged prejudicial spillover from a joint trial with Commissioner Martinez.

16

Our Court of Appeals instructs us to examine the "totality of the evidence, both direct and circumstantial, and interpret the evidence in the light most favorable to the [United States] as the verdict winner" in a sufficiency-of-the-evidence claim under Rule 29.[172] "The jury's verdict shall be upheld when 'substantial evidence from which a rational trier of fact could find the essential[] elements of the crime beyond a reasonable doubt.'"[173] "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high."[174] We "do not weigh evidence or determine the credibility of witnesses in making [our] determination[]" on a Rule 29 motion for acquittal.[175]

Our colleagues counsel we may grant a new trial under Rule 33 to cure errors in jury instruction "of sufficient magnitude."[176] But our Court of Appeals disfavors Rule 33(a) motions, holding we may only grant retrial if we "believe[] that 'there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'"[177] In evaluating a Rule 33 motion, we "do[] not view the evidence favorably to the Government, but instead exercise[] [our] own judgment in assessing the Government's case."[178]

We deny both motions. The jury heard overwhelming evidence supporting each challenged conviction. And Director O'Neal has not shown prejudice warranting a new trial.

### A. We deny Commissioner Martinez's motion for acquittal on the honest services wire fraud convictions.

The United States sought to prove Commissioner Martinez schemed to defraud the Virgin Islands and its citizens of the intangible right to Commissioner Martinez's honest services as a government official. The United States needed to adduce evidence allowing the jury to find beyond a reasonable doubt "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of the scheme."[179] "'[S]cheme or artifice to defraud' includes [one]

17

to deprive another of the intangible right of honest services."[180] Honest services fraud must be established through bribery or kickbacks.[181] A bribery theory of honest services also requires a *quid pro quo*—"a specific intent to give or receive something of value in exchange for an official act."[182]

Commissioner Martinez argues the United States failed to prove honest services wire fraud because there is no evidence of an official act under *McDonnell v. United States*, no bribery scheme, no specific interstate wire tied to the charged counts, and no intent to defraud.[183] We disagree.

### 1. Sufficient evidence supports the jury's finding of an official act.

Commissioner Martinez first argues the United States failed to prove an official act under *McDonnell* and characterizes the invoice approval as a routine administrative step.[184] He emphasizes the Mon Ethos contract and related payments moved through several agencies and officials before final approval or payment.[185] He asserts the evidence shows his limited role in a larger bureaucratic process but does not show a decision or action on a qualifying governmental matter.[186]

Congress defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."[187] The Supreme Court in *McDonnell* explained a qualifying "question, matter, cause, suit, proceeding or controversy" must be "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."[188] "'Pending' and 'may by law be brought' suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."[189]

The public official "must [also] make a decision or take an action *on* that question or matter, or agree to do so."[190] "Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of 'official act.'"[191] But if the public "official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act."[192] "A public official may also make a decision or take an action by using his official position to exert pressure on *another* official to perform an 'official act,'" or if he "uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official."[193] The public official also need not be the final decisionmaker. Our Court of Appeals has recognized a public official's recommendations concerning which contractors should be selected for government projects can constitute official acts even if the official does not possess final contracting authority.[194] We instructed the jury consistently with this standard, requiring it to find both a qualifying question or matter and a decision or action on the question or matter.[195]

The United States identified two questions or matters: Mon Ethos's Virgin Islands Police Department contract and the Government of the Virgin Islands' payment of Mon Ethos invoices. These matters were sufficiently focused. They involved a specific contractor, a specific agency relationship, a specific contract, and specific invoice payments from public funds. The contract and invoice payments were "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." Each involved "something within the specific duties of an official's position—the function conferred by the authority of his office."[196] The jury could therefore find both identified matters satisfied *McDonnell*'s threshold requirement of a focused question or matter pending before, or capable of being brought before, a public official.

19

The jury also heard sufficient evidence Commissioner Martinez took actions on those matters. Commissioner Martinez served as the head of the Police Department. Mon Ethos began providing services to the Police Department in 2022 without a formal contract; its invoices required approval from Commissioner Martinez before moving through the payment process; and Mr. Whitaker swore most invoices went directly to Commissioner Martinez. The jury heard evidence Commissioner Martinez sent a justification letter relating to Mon Ethos invoices to the Commissioner of Property and Procurement in November 2022, authored and signed a later justification letter requesting sole-source selection of Mon Ethos for a contract worth more than one million dollars, signed the Mon Ethos contract, and signed related grant documents as sub-grantee. The jury also heard evidence Commissioner Martinez approved or helped move Mon Ethos invoices, including invoices the jury could find were inflated to generate funds for personal expenses.

Commissioner Martinez's focus on the participation of Property and Procurement, the Attorney General's Office, the Governor's Office, OMB, and Finance does not defeat the verdict. The jury could properly find Commissioner Martinez's approvals, signatures, justification letters, and invoice-related conduct were not merely informal support or access; they were official steps taken by the head of the Police Department within the government's contracting and payment process. Nor did the jury have to accept Commissioner Martinez's description of invoice approval as a "rubber stamp." The evidence of Commissioner Martinez's role in the contract, invoice approvals, and invoice inflation—viewed together with evidence of benefits from Mr. Whitaker—allowed the jury to find official action on focused contract and payment matters involving Mon Ethos.

20

## 2. Sufficient evidence supports the jury's finding of a bribery scheme.

Commissioner Martinez next argues the United States failed to prove a bribery scheme and proved, at most, payments made in the context of a friendship and business relationship.[197] He emphasizes honest services fraud after *Skilling* is limited to bribery and kickback schemes and argues a lawful conviction requires proof of a corrupt exchange rather than gifts, favors, or payments made in the general context of a relationship.[198] He contends the United States impermissibly asked the jury to infer bribery from two facts: Mr. Whitaker gave him things of value and he approved Mon Ethos invoices.[199] He also relies on the Steak Out agreement as a documented, attorney-drafted explanation for the payments.[200] He argues the record shows a lawful business arrangement or personal assistance rather than a *quid pro quo*.[201]

"The bribery theory does not require that each *quid,* or item of value, be linked to a specific *quo,* or official act. Rather, a bribe may come in the form of a 'stream of benefits.'"[202] A "stream of benefits" theory "alters the typical *quid pro quo* standard just slightly and constitutes bribery[] when the parties intended the benefits to be exchanged for official action."[203] The United States need "not prove that each gift was provided with the intent to prompt a specific official act."[204] The requirement is satisfied if "the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor."[205] "[P]ayments may be made with the intent to retain the official's services on an as needed basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf."[206] And "[a] course of conduct of bribes that are disguised as 'favors and gifts' given to the public official may prove the briber's and bribee's corrupt intent through circumstantial evidence.[207] The jury had to find Mr. Whitaker "provided a benefit to [Commissioner Martinez] intending that [Commissioner Martinez] will thereby take favorable action that he would not

otherwise take [and] that [Commissioner Martinez] accepted those benefits intending, in exchange for the benefits, to take official acts to benefit [Mr. Whitaker]."[208]

The jury heard evidence allowing it to make both findings. Mr. Whitaker swore Mon Ethos had unpaid invoices and he became desperate to be paid. He swore he offered to help Commissioner Martinez with his restaurant by providing payments and things of value in exchange for Commissioner Martinez getting Mon Ethos's invoices paid. The jury then heard evidence of a continuing course of benefits flowing to Commissioner Martinez and his family: restaurant-supply purchases, construction payments, rent payments, tuition payments, travel expenses, and other payments by Mr. Whitaker or Mon Ethos.

The jury could consider this course of benefits alongside the timing and surrounding circumstances. The benefits began after Mon Ethos had unpaid invoices. They continued while Mon Ethos sought payment, pursued a formal, federally funded contract with the Police Department, and later submitted invoices the jury could find were inflated to generate funds for expenses unrelated to Mon Ethos's contractual work. The recorded discussions about increasing invoices, pushing payment, and using invoice proceeds for personal expenses allowed the jury to find the benefits were not merely gifts exchanged in friendship or payments under a legitimate business venture. The jury could instead find a stream-of-benefits bribery scheme: Mr. Whitaker provided continuing personal benefits to secure favorable action as Mon Ethos's needs arose, and Commissioner Martinez accepted those benefits intending to use his official role for Mr. Whitaker's benefit—when Mon Ethos needed action on invoices, the contract, or inflated payment requests.

The Steak Out agreement did not require the jury to find otherwise. Commissioner Martinez relied on the agreement as an attorney-drafted document reflecting a legitimate business

relationship. But the jury also heard Mr. Whitaker testify the agreement served as a cover for the payments. It could weigh the written agreement, attorney involvement, and stated business purpose against the timing of the payments, pattern of benefits, later invoice inflation, and Commissioner Martinez's recorded statements. Viewed in the light most favorable to the verdict, this evidence allowed the jury to find a corrupt agreement rather than innocent friendship or a lawful business venture.

### 3. Sufficient evidence supports the jury's finding specific interstate wires furthered the honest services fraud scheme.

Commissioner Martinez argues the United States failed to prove the wire element of honest services fraud because it did not identify specific wire transmissions tied to each honest services count.[209] He contends the United States relied on generalized bank-infrastructure testimony rather than evidence connecting each charged wire to the charged scheme.[210] We disagree.

The jury heard evidence identifying the charged wire transmissions by amount, timing, and context. It heard evidence of the December 2022 $20,018.10 electronic payment to Mon Ethos after Mr. Whitaker swore he began providing benefits to Commissioner Martinez to obtain payment on unpaid invoices. It heard evidence of the October 2023 $372,420.75 payment to Mon Ethos after the federally funded contract had been signed and Acting Commissioner Marsh approved the invoice. It heard evidence of the December 2023 $325,912 payment after recorded discussions in which Commissioner Martinez and Mr. Whitaker referred to resubmitting an invoice, adding "stuff" to it, and "pushing" payment. It heard evidence of the January 2024 $216,100 payment after recorded discussions about adding $70,000 to an invoice for Commissioner Martinez's and Director O'Neal's expenses. And it heard evidence of the April 2024 $17,730 wire to Yacht Haven Grande for Director O'Neal's lease after recorded discussions about

using the added invoice proceeds. The verdict sheet also identified the charged wire transmissions by count, amount, and date.

This evidence did not require the jury to guess which transactions the United States relied upon. The charged wires corresponded to identified payments, and the testimony, bank records, wire confirmations, and recordings allowed the jury to find those payments furthered the scheme. Viewed in the light most favorable to the jury's verdict, the United States adduced sufficient evidence tying specific wire transmissions to the honest services fraud scheme.

### 4. Sufficient evidence supports the jury's finding Commissioner Martinez acted with intent to defraud.

Commissioner Martinez argues the United States failed to prove intent to defraud. He contends the evidence shows only his receipt of benefits from a contractor and does not prove he knew he acted unlawfully or intended to deprive the public of honest services.[211] He again relies on the Steak Out agreement and attorney involvement.[212] He emphasizes the open and direct nature of the payments and argues the absence of intermediaries or concealment undermines fraudulent intent.[213] He further argues the payments funded restaurant expenses consistent with the agreement's stated business purpose.[214] He also stresses the United States recorded thousands of calls but produced no communication in which he admitted a corrupt purpose, agreed to exchange official action for payment, or acknowledged illegality.[215]

"[T]o act with an intent to defraud means to act knowingly and with the purpose to deceive or to cheat."[216] The "requisite *mens rea* is knowledge, not purpose."[217] A jury may "infer intent from circumstantial evidence."[218] And "intent to defraud is not abated by any alleged reliance on [one's] lawyers."[219] A rational juror could conclude Commissioner Martinez knowingly sought to deceive the Virgin Islands and its citizens and deprive them of his honest services. The jury did not need an express admission of illegality. It could infer intent from Commissioner Martinez's

24

recorded discussions about increasing invoices, using invoice proceeds for restaurant equipment, and adding money for Director O'Neal. It could also consider his conduct after learning of the federal investigation, including the promissory note offered to characterize earlier rent and tuition payments as loans. This evidence allowed the jury to reject Commissioner Martinez's good-faith explanation and find he acted with the required fraudulent intent.

**B. We deny Commissioner Martinez's motion for acquittal on the federal program bribery conviction.**

Commissioner Martinez next challenges his conviction for federal program bribery. He does not dispute the United States adduced evidence allowing the jury to find he served as an agent of the Virgin Islands, the Virgin Islands received more than $10,000 in federal benefits, the charged transaction involved at least $5,000, or he received things of value from Mr. Whitaker.[220] He instead challenges the "corrupt intent to be influenced or rewarded in connection with a specific transaction."[221] He argues the United States failed to prove a *quid pro quo* or "specific corrupt agreement."[222] He again relies on the Steak Out agreement, attorney involvement, the open nature of the payments, the physical evidence of restaurant equipment, the medical purpose of the Boston trips, and the promissory note as evidence of lawful conduct.[223]

Congress through section 666 criminalizes a public official's corrupt acceptance of something of value while "intending to be influenced or rewarded" in connection with government business, a transaction, or a series of transactions.[224] The Supreme Court clarified in *Snyder v. United States* a public official "violate[s the federal program bribery statute] when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act."[225] But the public "official does not violate [the statute] if the official has taken the official act before any reward is agreed to, much less given."[226] Our Court of Appeals has not squarely decided whether federal program bribery always requires proof of a *quid pro quo*.[227] We need not resolve

25

the broader question because, even assuming it does, the United States adduced sufficient evidence of a *quid pro quo*. A *quid pro quo* may be inferred from an ongoing course of conduct and "implied from [the parties'] words and actions."[228]

We reject Commissioner Martinez's challenge for substantially the same reasons we reject his challenge to the bribery-based honest services fraud convictions. This is not a case where the alleged benefits came only after all relevant official action had ended. Mr. Whitaker swore he provided benefits to Commissioner Martinez so Commissioner Martinez would get Mon Ethos's invoices paid. The jury could find more than a general relationship of payments, friendship, and professional connection. It could credit Mr. Whitaker's testimony based on the timing of the benefits. It could also consider Mr. Whitaker's continued need for government action on unpaid invoices and a federally funded contract together with the recorded invoice discussions and the later use of invoice proceeds for Commissioner Martinez's personal expenses.

Commissioner Martinez's lawful-conduct evidence did not require a different finding. The Steak Out agreement, attorney involvement, restaurant equipment, Boston medical travel, and promissory note gave the jury an innocent explanation to consider. But the jury could weigh those facts against the broader record and reject Commissioner Martinez's lawful explanation. The jury had an ample basis to find Commissioner Martinez accepted things of value intending to be influenced or rewarded in connection with Mon Ethos's contract and invoice payments. We deny Commissioner Martinez's motion as to the federal program bribery conviction.

### C. We deny Commissioner Martinez's motion for acquittal on the money laundering conspiracy conviction.

Commissioner Martinez next challenges his conviction for money laundering conspiracy. He first argues the conviction fails because money laundering depends on proceeds of a specified unlawful activity and the United States failed to prove honest services fraud or federal program

bribery.[229] He also argues the United States failed to prove he knew the funds were criminal proceeds.[230] He contends the United States showed normal financial activity at most and again relies again on the Steak Out agreement, attorney involvement, open payments, restaurant-related expenses, and medical travel evidence as showing lawful business or personal transactions rather than money laundering.[231]

A conspiracy to commit money laundering required the United States to prove an agreement to knowingly engage in a monetary transaction involving criminally derived property worth more than $10,000 and derived from specified unlawful activity.[232] The United States also had to prove Commissioner Martinez knowingly joined the agreement.[233] Section 1957 does not require proof the transaction concealed proceeds or promoted unlawful activity. Commissioner Martinez's reliance on *United States v. Fallon* is misplaced. *Fallon* involved a conspiracy to commit concealment money laundering under section 1956(a)(1)(B)(i).[234] Count Eight instead charged a conspiracy with section 1957 and section 1957 does not require proof the "transaction [was] designed . . . to conceal the nature, location, source, ownership, or control of" criminal proceeds.[235]

We reject the derivative challenge because we reject Commissioner Martinez's challenges to the honest services fraud and federal program bribery convictions. The money laundering conspiracy count therefore does not fail for lack of a predicate offense. The jury also heard sufficient evidence Commissioner Martinez knew the funds were criminally derived. The monetary transactions involved the same invoice proceeds addressed above, including proceeds the jury could find resulted from inflated invoices and were later used for expenses outside Mon Ethos's contractual work. Given Commissioner Martinez's recorded discussions about increasing

invoices and using proceeds for expenses, the jury could find he understood these were not ordinary business funds.

**D. We deny Commissioner Martinez's motion for acquittal on the obstruction of justice by falsification of records conviction.**

Commissioner Martinez lastly challenges his conviction for obstruction of justice by falsification of records. He does not challenge his separate conviction for obstruction by corrupt persuasion.[236] He argues the United States failed to "prove a nexus between the obstructive act and a specific pending or contemplated official proceeding."[237] He contends the promissory note does not establish obstruction because he produced it through counsel in response to a grand jury subpoena and because the note's repayment terms were consistent with a genuine loan arrangement.[238] He also argues the laptop evidence proves nothing more than his brief use of Ms. Blyden's computer and characterizes the falsification theory as speculation rather than proof of an obstructive act.[239]

An individual obstructs justice under section 1519 if he "knowingly falsified documents and did so with the intent to 'impede, obstruct, or influence the investigation or proper administration of any matter' that happens to be within federal jurisdiction."[240] Our Court of Appeals does not require proof of "a sufficient 'nexus' between his conduct and the federal investigation."[241] The United States needed to prove only: "(1) [Commissioner Martinez] intended to impede an investigation into 'any matter' and (2) the matter at issue was ultimately proven to be within the federal government's jurisdiction. It was not required to prove that [he] intended to obstruct or impede a specific federal investigation."[242]

We reject Commissioner Martinez's challenge. The jury heard evidence Commissioner Martinez created or caused the creation of a promissory note after learning of the federal investigation and then produced it in response to a grand jury subpoena as an explanation for earlier

payments. The jury could find the note's August 15, 2023 date, its characterization of rent and tuition payments as loans, and the absence of repayment evidence showed a knowingly false record made to influence the investigation. Ms. Blyden's laptop testimony did not need to establish falsification by itself. The jury could consider it with the promissory note, the timing of its creation, and Commissioner Martinez's recorded statements about how Mr. Whitaker should explain the payments if questioned. This evidence allowed the jury to find Commissioner Martinez knowingly falsified a record with intent to impede, obstruct, or influence a matter within federal jurisdiction.

### E. We deny Director O'Neal's motion for acquittal on the federal program bribery conviction.

Director O'Neal challenges the sufficiency of the evidence supporting her federal program bribery conviction. She argues the United States failed to prove she accepted the $17,730 lease payment as part of a bribe rather than as a gift from Commissioner Martinez.[243] She emphasizes Mr. Whitaker did not ask her for anything in return when discussing the payment for her commercial lease and characterizes the payment as, at most, a gratuity rather than a bribe.[244] She separately argues the United States failed to prove an official act because it abandoned at trial the allegation she "pressured" Ms. Gaston to approve Mon Ethos invoices.[245]

The section 666 standard applied to Commissioner Martinez also applies to Director O'Neal. A public official violates the statute by corruptly accepting something of value "intending to be influenced or rewarded" in connection with government business, a transaction, or a series of transactions.[246] The Supreme Court in *Snyder* instructs section 666 "is a bribery statute and not a gratuities statute" and "bribery requires that the official have a corrupt state of mind and accept (or *agree to accept*) the payment intending to be influenced in the official act."[247] The Supreme Court illustrated the point by describing "a bribe where the agreement was made before the act but the payment was made after the act."[248] In such a circumstance, "[a]n official might try to defend

29

against the bribery charge by saying that the payment was received only after the official act and therefore could not have 'influenced' the act."[249] But "[b]y including the term 'rewarded,' Congress made clear that the timing of the agreement is the key, not the timing of the payment, and thereby precluded such a potential defense."[250] So the statute reaches a public official who "agrees to a future reward for a future official act."[251]

Director O'Neal incorrectly asserts "[t]o convict her of bribery, the [United States] was required to establish beyond a reasonable doubt that she committed or agreed to commit an official act" and cites *McDonnell* and *Skilling*.[252] We do not read section 666 to require proof of an "official act" as defined in section 201 and later clarified in *McDonnell*. Our Court of Appeals has not resolved whether *McDonnell* applies to section 666 and several courts of appeals have held it does not.[253] The statutory text supports this distinction.[254] Congress did not include section 201's "official act" requirement or definition in section 666 and defined "official act" in section 201 only "[f]or the purpose of this section."[255] Neither statute cross-references the other. Although the Supreme Court in *Snyder* used the phrase "official act" when discussing section 666, it did not invoke section 201's definition or rely on *McDonnell*.[256] We instead instructed the jury consistent with section 666's text: the United States had to prove Director O'Neal accepted, agreed to accept, solicited, or demanded something of value corruptly and with the intent to be influenced or rewarded in connection with some business or transaction of the Virgin Islands.[257] Nor did the United States need to prove an explicit *quid pro quo*.[258] A *quid pro quo* may be inferred from an ongoing course of conduct and implied from the parties' words and actions.[259]

Director O'Neal's argument fails because the jury could find she agreed to accept a future reward before action on the relevant government transaction. Mr. Whitaker met with Director O'Neal on January 14, 2024 and discussed adding money for her to the Mon Ethos invoice before

the $216,100 payment processed. The jury heard evidence the invoice included added money for Director O'Neal and Commissioner Martinez rather than for Mon Ethos's work. Director O'Neal then responded to Mr. Whitaker's January 20, 2024 question about whether the invoice had processed and directed her staff to ensure American Rescue Plan Act-related invoices moved forward for the next payment cycle. The later $17,730 lease payment therefore did not have to be viewed as an after-the-fact gratuity. Nor did the jury have to accept Director O'Neal's characterization of the lease payment as a gift from Commissioner Martinez. It could infer a corrupt agreement without an express request from Mr. Whitaker based on the January 14 discussion, Director O'Neal's direction to move invoices forward, the $216,100 payment to Mon Ethos a few days later, the later discussion about using the added proceeds, followed by her receipt of the lease-payment benefit. This evidence allowed the jury to find Director O'Neal and Mr. Whitaker tied the lease payment to action on Mon Ethos's pending invoice payment which is a business or transaction of the Virgin Islands.

### F. We deny Director O'Neal's motion for acquittal on the honest services wire fraud and money laundering conspiracy convictions.

Director O'Neal does not meaningfully challenge the honest services wire fraud convictions apart from her attack on the bribery theory and her argument she could not foresee the wire.[260] She argues she could not foresee the wire because Commissioner Martinez sought to provide a cash gift and avoid a traceable wire transfer.[261] Nor does she separately develop a challenge to the money laundering conspiracy conviction apart from her claim the bribery evidence is not sufficient for conviction.[262] She argues the bribery count is a "constituent element" of the honest services wire fraud and money laundering convictions so those convictions must fall with the bribery conviction.[263]

31

We reject this derivative argument because we reject Director O'Neal's challenge to the bribery conviction. We also reject her "official act" argument to the extent she invokes the same theory as to honest services wire fraud. The jury could readily find her directive to Ms. Gaston exerted pressure on another official to act on a pending government payment matter or, at minimum, provided advice intended to form the basis for official action.[264]

Director O'Neal's separate foreseeability challenge does not warrant relief. "If [Director O'Neal] should 'reasonably have foreseen' use of the interstate wire communication, [she] will be deemed to have used 'interstate wires' within the meaning of the statute—even if [s]he did not personally send the wire or instruct someone else to do so."[265] The jury heard evidence Director O'Neal participated in discussions about using the added invoice proceeds for her lease. Mr. Whitaker asked Director O'Neal whether she wanted the payment wired and Director O'Neal responded, "I guess" and "[w]ire means it's traced." She later provided the exact amount owed and received the benefit of Mr. Whitaker's $17,730 payment to Yacht Haven Grande. The jury could readily find Director O'Neal reasonably anticipated a wire transfer could be used to pay the lease deposit.

### G. We deny Director O'Neal's request for a new trial based on denial of severance.

Director O'Neal alternatively seeks a new trial because she "should have been grant[ed] a trial separate and apart from [Commissioner] Martinez."[266] She argues the indictment charged her "along with" Commissioner Martinez with a scheme beginning in November 2022 even though the evidence showed Mr. Whitaker's and Commissioner Martinez's relationship predated her involvement.[267] She further contends we should have severed the trial once an adverse defense became apparent.[268] She also argues the stronger evidence against Commissioner Martinez spilled over and prevented the jury from separately weighing the evidence against her.[269]

32

Director O'Neal did not preserve a severance argument. A defendant must file a motion to sever before trial and failure to do so may constitute waiver.[270] Commissioner Martinez moved for severance during trial.[271] Director O'Neal "t[ook] no position" when asked about the motion.[272] She did not file a severance motion before trial, join Commissioner Martinez's motion for severance, or request a severance based on "prejudicial variance," an adverse defense, or prejudicial spillover. Director O'Neal "should have raised h[er] severance argument when [the grounds for severance became apparent], and by failing to do so, [s]he waived it."[273]

Even if we considered Director O'Neal's argument, she has not shown clear and substantial prejudice. A "'fundamental princip[le]' of federal criminal law is the 'preference for joint trials of defendants who are indicted together'" and "the preference 'is particularly strong in cases involving multiple defendants charged under a single conspiracy.'"[274] "A defendant seeking a new trial due to the denial of a severance motion must show that the joint trial led to clear and substantial prejudice resulting in a manifestly unfair trial, a demanding standard that requires more than mere allegations of prejudice."[275] A defendant is "not entitled to severance merely because they may have a better chance of acquittal in separate trials."[276] The "critical issue" when considering the potential for prejudice is "not whether the evidence against a co-defendant is more damaging but rather whether the jury will be able to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility."[277]

Director O'Neal's argument rests primarily on her claim the United States presented stronger and more extensive evidence against Commissioner Martinez. But "severance is not required simply because the evidence against [a] co-defendant[] may be stronger than the evidence against" the defendant.[278] Joint trials often involve evidence differing in force and scope among persons charged with crimes. The United States presented a narrower, but distinct and readily

33

capable of separate consideration, case against Director O'Neal. It focused on the January 2024 invoice, Director O'Neal's communications with Mr. Whitaker and Office of Management and Budget staff, the April 6 meeting, the lease amount she provided, and Mr. Whitaker's $17,730 payment to Yacht Haven Grande for Director O'Neal's coffee shop. The jury could separately evaluate whether this evidence proved her knowing participation in the charged offenses.

Our instructions further reduced the risk of spillover prejudice. We instructed the jury they "must separately consider the evidence against each person on each offense charged and [they] must return a separate verdict for each defendant on each offense."[279] We underscored their "decision on any one defendant or any one offense, whether guilty or not guilty, should not influence [their] decision on any other defendants or offenses. Each defendant and each offense should be considered separately."[280] "[W]e presume that the jury follows instructions, which 'often will suffice to cure any risk of prejudice'" and Director O'Neal identifies "no reason to believe otherwise."[281] Her dismissive argument the jury deliberated quickly does not support a finding the "case [against her] was misunderstood or simply given short shrift."[282] Director O'Neal therefore has not shown prejudice warranting a new trial.[283]

## III.    Conclusion

Commissioner Martinez and Director O'Neal do not offer grounds to vacate the jury's findings of guilt on all charges. The United States presented ample evidence of the senior public officials violating federal law. But it went further. They knew they were doing so and the evidence confirms they proceeded the selling the public trust to help fund their dreams of restaurant and café entrepreneurs in addition to drawing salaries from the public trust. The former public officials presented every argument. The jury, informed by unchallenged jury instructions presented after extensive discussions with counsel, found their arguments unpersuasive. The jury found

34

Commissioner Martinez and Director O'Neal violated several federal criminal laws beyond a reasonable doubt.

---

[1] Trial Tr. 127:21–128:4, Dec. 4, 2025 (ECF 184).

[2] Trial Tr. 66:10–14, 68:15–18, Dec. 5, 2025 (ECF 185).

[3] *Id.* 68:23–69:4. Commissioner Martinez's counsel referred to Mr. Whitaker's company as the Office of Data Discovery Forensic Analysis and Mr. Whitaker agreed the Office of Data Discovery performed work like Mon Ethos. *Id.*

[4] Trial Tr. 128:20–129:3, Dec. 4, 2025 (ECF 184).

[5] *Id.* 129:4-5; Trial Tr. 82:13–20, 84:17–19, Dec. 5, 2025 (ECF 185).

[6] Trial Tr. 63:1–12, Dec. 8, 2025 (ECF 186).

[7] Trial Tr. 132:24–133:13, Dec. 4, 2025 (ECF 184). An electronic bank-to-bank transfer through the Automated Clearing House network is commonly called an "ACH" transfer.

[8] *See, e.g.,* Trial Exs. 6, 51, 64, 80, 81.

[9] Trial Tr. 137:7–140:14, Dec. 4, 2025 (ECF 184); Trial Exs. 3–4.

[10] Trial Tr. 133:14–134:6, Dec. 4, 2025 (ECF 184).

[11] *Id.* 134:7–15.

[12] *Id.* 134:16–20.

[13] *Id.* 136:20–137:3.

[14] *Id.* 136:6–24; Trial Ex. 2. Mon Ethos maintained its bank account at First Bank.

[15] Trial Tr. 137:7–138:14, 138:25–139:3, Dec. 4, 2025 (ECF 184); Trial Ex. 3.

[16] Trial Tr. 141:5–20, Dec. 4, 2025 (ECF 184); Trial Ex. 5.

[17] Trial Tr. 141:25–143:15, Dec. 4, 2025 (ECF 184); Trial Ex. 6.

[18] Trial Tr. 143:16–145:24, 146:17–152:23, Dec. 4, 2025 (ECF 184); Trial Exs. 8, 9, 11-19.

[19] Trial Tr. 152:24–153:4, Dec. 4, 2025 (ECF 184).

[20] *Id.* 153:4–11.

[21] *Id.* 153:12–18; Trial Ex. 20.

[22] Trial Tr. 153:12–18, Dec. 4, 2025 (ECF 184).

[23] Trial Tr. 116:15–19, 118:6–10, Dec. 5, 2026 (ECF 185).

[24] *Id.* 118:6–18.

[25] Trial Tr. 157:11–16, Dec. 4, 2025 (ECF 184).

[26] Trial Tr. 111:19–112:16, Dec. 5, 2026 (ECF 185).

[27] *Id.* 115:5–23.

[28] Trial Tr. 158:1–3, Dec. 4, 2025 (ECF 184).

[29] *Id.* 158:4–159:9; Trial Ex. 21.

[30] Trial Tr. 159:10–17, Dec. 4, 2025 (ECF 184).

[31] *Id.* 160:13–162:9, 182:1–19, 185:2–11; Trial Exs. 22, 30.

[32] Trial Tr. 172:10–22, 175:25–176:11, Dec. 4, 2025 (ECF 184).

[33] *Id.* 174:21–175:24; Trial Ex. 26.

[34] Trial Tr. 172:23–174:13, 176:12–178:21, 180:8-181:25, 185:12-187:4, 190:14-197:22, 259:10–261:12, Dec. 4, 2025 (ECF 184); Trial Exs. 25, 28, 31–32, 36, 38–41, 44.

[35] Trial Tr. 123:17–24, Dec. 5, 2026 (ECF 185).

[36] *Id.* 123:25–124:24.

[37] *Id.* 124:25–126:21.

[38] *Id.* 83:9–84:19.

[39] Trial Tr. 66:14–67:18, 113:13–114:5, Dec. 4, 2025 (ECF 184).

[40] *Id.* 68:24–69:16.

[41] *Id.* 69:17–70:15.

[42] *Id.* 71:20–72:16.

[43] *Id.* 189:10–190:13.

[44] *Id.* 77:11–78:4.

[45] *Id.* 75:17–76:10; Trial Ex. 46.

[46] Trial Tr. 84:20–87:23, Dec. 5, 2026 (ECF 185).

[47] *Id.* 85:5-9, 86:8–87:19.

[48] Trial Tr. 203:4–204:6, Dec. 4, 2025 (ECF 184); Trial Tr. 168:14–169:10, Dec. 8, 2025 (ECF 186); Trial Ex. 46.

[49] Trial Tr. 78:21–80:14, Dec. 4, 2025 (ECF 184); Trial Tr. 162:21–164:4, Dec. 8, 2025 (ECF 186).

[50] Trial Tr. 80:15–22, Dec. 4, 2025 (ECF 184).

[51] *Id.* 187:10–189:9; Trial Exs. 33, 35.

[52] Trial Tr. 198:4–199:12, Dec. 4, 2025 (ECF 184); Trial Ex. 42.

[53] Trial Tr. 195:18–196:3, Dec. 4, 2025 (ECF 184); Trial Ex. 40.

[54] Trial Tr. 200:17–201:25, Dec. 4, 2025 (ECF 184); Trial Ex. 45.

[55] Trial Tr. 207:13–15, Dec. 4, 2025 (ECF 184).

[56] *Id.* 204:7–12.

[57] *Id.* 256:6–19.

[58] *Id.* 219:22–220:13; Trial Ex. 47.

[59] Trial Tr. 222:1–6, Dec. 4, 2025 (ECF 184).

[60] *Id.* 220:16–221:24.

[61] *Id.* 223:24–227:2; Trial Exs. 48–49.

[62] Trial Tr. 205:21–206:13, Dec. 4, 2025 (ECF 184); Trial Ex. 51.

[63] Trial Tr. 206:14–25, Dec. 4, 2025 (ECF 184).

[64] Trial Tr. 201:10–25, Dec. 8, 2025 (ECF 186). Deputy Commissioner Marsh acted as commissioner for one week in October 2023 because Commissioner Martinez and the assistant commissioner were outside the territory. *Id.* 206:6–12.

[65] *Id.* 205:15–206:19. Deputy Commissioner Marsh also explained the ordinary invoice process. After an acting commissioner signs an invoice, the invoice returns to fiscal; fiscal enters it in the system; and depending on the amount, the invoice may need to go to Property and Procurement for a purchase order or enter the system for payment. *Id.* 218:16–25. He agreed vendors often ask where a payment stands in the process and government officials may call other agencies or commissioners to check the status. *Id.* 219:1–17.

[66] *Id.* 214:16–216:18.

[67] *Id.* 212:2–5.

[68] Trial Tr. 233:1–20, Dec. 4, 2025 (ECF 184); Trial Ex. 52.

[69] Trial Tr. 231:10–232:25, Dec. 4, 2025 (ECF 184); Trial Exs. 56A–B.

[70] Trial Tr. 233:21–234:4, Dec. 4, 2025 (ECF 184).

[71] Trial Ex. 57A.

[72] *Id.*; Trial Tr. 234:22–15, Dec. 4, 2025 (ECF 184).

[73] Trial Tr. 252:3–253:5, Dec. 4, 2025 (ECF 184); Trial Ex. 61A. Commissioner Martinez also discussed signing invoices in a November 6, 2023 recorded call and Mr. Whitaker swore the call also referenced expenses relating to a third Boston trip. Trial Tr. 237:1–238:13, Dec. 4, 2025 (ECF 184); Trial Exs. 58A–B.

[74] Trial Tr. 253:23–254:21, Dec. 4, 2025 (ECF 184); Trial Ex. 61B.

[75] Trial Tr. 254:22–255:24, Dec. 4, 2025 (ECF 184); Trial Ex. 62.

[76] Trial Tr. 257:2–258:12, Dec. 4, 2025 (ECF 184); Trial Ex. 64. Mr. Whitaker also identified a November 30, 2023 invoice to Mario Brooks of the Police Department, which Mr. Whitaker swore he would have sent to Commissioner Martinez as well, and a $251,400 payment from the Government of the Virgin Islands. Trial Tr. 258:5–259:9, Dec. 4, 2025 (ECF 184); Trial Exs. 63–64.

[77] Trial Tr. 259:10–261:12, Dec. 4, 2025 (ECF 184); Trial Exs. 64–65.

[78] Trial Tr. 261:13–264:20, Dec. 4, 2025 (ECF 184); Trial Exs. 66–67.

[79] Trial Tr. 265:1–19, Dec. 4, 2025 (ECF 184); Trial Ex. 68.

[80] Trial Tr. 266:22–267:1, Dec. 4, 2025 (ECF 184).

[81] Trial Ex. 71B.

[82] *Id.*

[83] Trial Tr. 268:2–268:10, Dec. 4, 2025 (ECF 184).

[84] Trial Ex. 72.

[85] *Id.*

[86] *Id.*

[87] Trial Tr. 269:11–24, Dec. 4, 2025 (ECF 184).

[88] Trial Ex. 73.

[89] *Id.*

[90] Trial Tr. 13:4–15, Dec. 5, 2025 (ECF 185).

[91] *Id.* 13:19–24; Trial Exs. 74A–B.

[92] Trial Tr. 13:25-14:18, Dec. 5, 2025 (ECF 185); Trial Ex. 74A.

[93] Trial Ex. 74A.

[94] *Id.*; Trial Tr. 14:21-22, Dec. 5, 2025 (ECF 185).

[95] Trial Ex. 74A.

[96] Trial Tr. 16:14–19, Dec. 5, 2025 (ECF 185); Trial Ex. 74B.

[97] Trial Ex. 74B.

[98] *Id.*

[99] *Id.*

[100] Trial Ex. 77.

[101] Trial Tr. 35:13–36:10, Dec. 5, 2025 (ECF 185); Trial Ex. 77.

[102] Trial Tr. 36:15–20, Dec. 5, 2025 (ECF 185); Trial Ex. 77.

[103] Trial Tr. 206:1–207:19, Dec. 9, 2025 (ECF 187); Trial Ex. 78. "The federal grants manager has administrative oversight over the [federal] grants that is received by [the Office of Management and Budget] and also that passes through the Office of Management and Budget," including the American Rescue Plan Act grants. Trial Tr. 201:19–202:13 Dec. 9, 2025 (ECF 187).

Ms. Gaston also described the ordinary process for American Rescue Plan Act-funded invoices. She swore Office of Management and Budget staff checked whether an invoice had supporting documentation; the invoice then went through Property and Procurement, became a purchase order if approved, and then went to Finance for review and approval. *Id.* 204:13–22. She also confirmed the Office of Management and Budget did not make the ultimate decision whether an invoice got paid. *Id.* 214:3–5.

[104] Trial Ex. 78.

[105] Trial Tr. 207:16–208:3 Dec. 9, 2025 (ECF 187).

[106] Trial Tr. 36:21–37:8, Dec. 5, 2025 (ECF 185).

[107] Trial Tr. 36:24–37:11, Dec. 5, 2025 (ECF 185); Trial Ex. 79.

[108] Trial Tr. 37:13–37:18, Dec. 5, 2025 (ECF 185); Trial Ex. 79.

[109] Trial Tr. 37:20–37:24, Dec. 5, 2025 (ECF 185); Trial Ex. 79.

[110] Trial Tr. 38:5–23, Dec. 5, 2025 (ECF 185); Trial Ex. 80.

[111] Trial Tr. 39:1–25, Dec. 5, 2025 (ECF 185); Trial Ex. 81.

[112] Trial Tr. 40:13–41:16, Dec. 5, 2025 (ECF 185); Trial Ex. 82.

[113] Trial Tr. 41:17–42:12, Dec. 5, 2025 (ECF 185); Trial Exs. 84A–B.

[114] Trial Ex. 84B.

[115] Trial Tr. 42:19–43:19, Dec. 5, 2025 (ECF 185); Trial Ex. 85.

[116] Trial Tr. 43:20–45:21, Dec. 5, 2025 (ECF 185); Trial Exs. 86–87.

[117] Trial Tr. 45:22–46:12, Dec. 5, 2025 (ECF 185); Trial Ex. 88.

[118] Trial Tr. 46:18–47:3, Dec. 5, 2025 (ECF 185).

[119] Trial Ex. 88.

[120] *Id.*

[121] *Id.*

[122] Trial Tr. 47:9–15, Dec. 5, 2025 (ECF 185).

[123] Trial Ex. 88.

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] Trial Tr. 49:8–50:8, Dec. 5, 2025 (ECF 185); Trial Ex. 89.

[128] Trial Tr. 48:7–13, 50:9–51:7, Dec. 5, 2025 (ECF 185); Trial Ex. 90.

[129] Trial Tr. 51:8–12, Dec. 5, 2025 (ECF 185).

[130] *Id.* 51:13–52:11; Trial Ex. 91.

[131] Trial Tr. 52:9–52:11, Dec. 5, 2025 (ECF 185).

[132] Trial Tr. 231:12–20, Dec. 8, 2025 (ECF 186). Mr. Irons swore Yacht Haven Grande maintained lease-related records for commercial tenants, including letters of intent, lease documents, invoices,

and statements. *Id.* 229:22–232:4. He also confirmed Director O'Neal ran Java Grande. *Id.* 240:19–23.

[133] *Id.* 232:5–17, 233:5–19, 234:1–236:1; Trial Ex. 91.

[134] Trial Tr. 236:25–237:5, Dec. 8, 2025 (ECF 186).

[135] *Id.* 143:8–23.

[136] *Id.* 143:24–144:2.

[137] *Id.* 144:3–18.

[138] *Id.* 145:11–17.

[139] *Id.* 191:13–195:1.

[140] *Id.* 195:5–195:23, 200:7–12.

[141] *Id.* 197:2–24.

[142] Trial Tr. 52:19–53:3, Dec. 5, 2025 (ECF 185).

[143] *Id.* 57:11–58:8; Trial Ex. 94.

[144] Trial Tr. 58:10–21, Dec. 5, 2025 (ECF 185); Trial Ex. 94.

[145] Trial Tr. 55:22-57:10, Dec. 5, 2025 (ECF 185).

[146] *Id.* 62:12–63:8; Trial Ex. 96.

[147] Trial Tr. 85:3–18, Dec. 8, 2025 (ECF 186). Ms. Blyden swore she had known Commissioner Martinez for more than twenty years and they previously "had a good friendship." *Id.* 84:14–85:2.

[148] *Id.* 85:19–86:14.

[149] *Id.* 86:15–24.

[150] *Id.* 89:9–90:4.

[151] *Id.* 92:4–19.

[152] *Id.* 87:1–24.

[153] Trial Ex. 95A.

[154] *Id.*; Trial Ex. 97.

[155] *Id.*

[156] Trial Ex. 95A.

[157] Trial Tr. 61:13–17, Dec. 5, 2025 (ECF 185).

[158] Trial Ex. 97.

[159] Trial Tr. 57:21–58:3, Dec. 9, 2025 (ECF 187). Agent Whitworth served as the Bureau case agent. He testified about his review of bank records, financial records, recorded calls, invoices, and other documents obtained during the investigation. *Id.* 6:19–199:20.

[160] Ex. 95B.

[161] *Id.*

[162] Trial Tr. 61:20–62:2, Dec. 5, 2025 (ECF 185).

[163] *Id.* 62:3–10; Trial Ex. 95C.

[164] Trial Tr. 101:4–13, Dec. 8, 2025 (ECF 186).

[165] Trial Tr. 209:4–17, Dec. 4, 2025 (ECF 184).

[166] *Id.* 209:18–210:1.

[167] *Id*. 210:2–211:9.

[168] *Id.* 211:10–22.

[169] *Id.* 211:25–213:21.

[170] Federal Rule of Criminal Procedure 29 requires us to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a) (governing motions for acquittal made before submission to the jury). Federal Rule of Criminal Procedure 33 allows us to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

[171] Commissioner Martinez titles his motion as a "Renewed Motion for Judgment of Acquittal and New Trial." ECF 192. But he only briefed sufficiency arguments under Rule 29 and does not separately argue a basis for a new trial under Rule 33. *Id.* We address his motion as a renewed motion for judgment of acquittal.

[172] *United States v. Dougherty*, No. 19-64, 2023 WL 2226780, at *5 (E.D. Pa. Feb. 24, 2023) (quoting *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009)), *aff'd sub nom., United States v. Henon*, No. 23-1463, 2024 WL 2746981 (3d Cir. May 29, 2024)).

[173] *Id.*

[174] *Id.*; *see also United States v. Pawlowski*, 27 F.4th 897, 902 (3d. Cir. 2022).

[175] *United States v. Zayas*, 32 F.4th 211, 216–17 (3d Cir. 2022) (alteration in original) (quoting *United States v. Gambone*, 314 F.3d 163, 169–70 (3d Cir. 2003)).

[176] *United States v. Ortiz*, No. 22-381, 2025 WL 449534, at *2 (E.D. Pa. Feb. 10, 2025) (quoting *United States v. Brown*, No. 90-144, 1991 WL 7378, at *4 (E.D. Pa. Jan. 22, 1991)).

[177] *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).

[178] *Id.*

[179] *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012) (quoting *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001), *abrogated on other grounds, Skilling v. United States*, 561 U.S. 358 (2010)); *see also* 18 U.S.C. § 1343.

[180] 18 U.S.C. § 1346.

[181] *Skilling*, 561 U.S. at 368.

[182] *Dougherty*, 2023 WL 2226780, at *6 (quoting *United States v. Wright*, 665 F.3d 560, 567-68 (3d Cir. 2012)).

[183] ECF 192 at 5–15.

[184] ECF 192 at 5-6.

[185] *Id.* at 6-11.

[186] *Id.* at 11-12.

[187] *McDonnell v. United States*, 579 U.S. 550, 566 (2016) (quoting 18 U.S.C. § 201(a)(3)); *see also United States v. Fattah*, 914 F.3d 112, 152 (3d Cir. 2019).

[188] *Fattah*, 914 F.3d at 152–53 (quoting *McDonnell*, 579 U.S. at 574).

[189] *Id.* (quoting *McDonnell*, 579 U.S. at 552).

[190] *McDonnell*, 579 U.S. at 572 (emphasis in original).

[191] *Id.* at 574.

[192] *Id.* at 573.

[193] *Id.* at 572 (emphasis in original).

[194] *United States v. Repak*, 852 F.3d 230, 253-54 (3d Cir. 2017); *see id.* at 254 ("[I]n his capacity as [the organization's] Executive Director, [the defendant] made recommendations to the [] Board of Directors as to which contractors should be used on specific projects. . . . [The defendant] had the power to, and indeed did, make recommendations to the [Board] as to the contractors it hired for projects. . . . The evidence was sufficient for the jury to conclude that he accepted the roof and

excavating services knowing that he was to use his power, i.e., the ability to provide advice, to influence the [Board]'s awarding of contracts."); *United States v. Menendez*, 291 F. Supp. 3d 606, 613-19 (D.N.J. 2018) (finding a United States Senator's calls to the State Department and efforts to influence Medicare reimbursement policy could constitute official acts even though the Senator lacked direct control over those agencies' ultimate decisions).

[195] Trial Tr. 173:21–176:11, Dec. 10, 2025 (ECF 188).

[196] *McDonnell*, 579 U.S. at 570.

[197] ECF 192 at 12.

[198] *Id*.

[199] *Id*.

[200] *Id.* at 13.

[201] *Id*.

[202] *United States v. Ciavarella*, 716 F.3d 705, 730 (3d Cir. 2013) (citation modified).

[203] *Dougherty*, 2023 WL 2226780, at *6 (quoting *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007)).

[204] *Id.*

[205] *Id.*

[206] *Id.*

[207] *Id.* (citing *Wright*, 665 F.3d at 568).

[208] *Id.*

[209] ECF 192 at 13–14.

[210] *Id.*

[211] *Id.* at 14–15.

[212] *Id.* at 14.

[213] *Id.*

[214] *Id.*

[215] *Id.* at 14–15.

[216] *United States v. Hartline*, 746 F. App'x 124, 128–29 (3d Cir. 2018) (quoting *United States v. Leahy*, 445 F.3d 634, 644 (3d Cir. 2006)).

[217] *United States v. Sater*, No. 22-1621, 2023 WL 3734962, at *3 (3d Cir. May 31, 2023) (citing 18 U.S.C. § 1344).

[218] *United States v. Alleyne*, 772 F. App'x 21, 24 (3d Cir. 2019) (citing *United States v. Riley*, 621 F.3d 312, 333 (3d Cir. 2010)); *see also United States v. Bryant*, 655 F.3d 232, 243 (3d Cir. 2011) ("The Government may prove *mens rea* with circumstantial evidence. . . .").

[219] *Riley*, 621 F.3d at 333.

[220] ECF 192 at 15.

[221] *Id*.

[222] *Id.* at 15–16.

[223] *Id.* at 15–17.

[224] *See* 18 U.S.C. § 666(a)(1)(B) (making it a federal crime when a public official "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more").

[225] *Snyder v. United States*, 603 U.S. 1, 19 (2024) (citing *United States v. Fernandez*, 722 F.3d 1, 23 (1st Cir. 2013) ("[T]he word 'reward' "clarifies that a bribe can be promised before, but paid after, the official's action.").

[226] *Snyder*, 603 U.S. at 19.

[227] *See United States v. Willis*, 844 F.3d 155, 164 (3d Cir. 2016) ("[E]ven if we were to require the United States to allege and prove a *quid pro quo* to establish a § 666 bribery offense—which we decline to do here—we conclude that it was adequately alleged. . . ."); *see also Henon*, 2024 WL 2746981, at *3 ("As the Supreme Court and this Court have explained, a *quid pro quo* agreement 'need not be explicit' except in the campaign contribution context.") (citing *McDonnell*, 579 U.S. at 572; *United States v. Bradley*, 173 F.3d 225, 232 (3d Cir. 1999), *corrected*, 188 F.3d 98 (3d Cir. 1999); *Kemp*, 500 F.3d at 284; *Andrews*, 681 F.3d at 527).

[228] *United States v. Davis*, 841 F. App'x 375, 379–80 (3d Cir. 2021) (quoting *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring)).

[229] ECF 192 at 17.

[230] *Id.* at 18–19.

[231] *Id*.

[232] 18 U.S.C. §§ 1956(h), 1957(a).

[233] *Id.*

[234] *United States v. Fallon*, 61 F.4th 95, 115–16 (3d Cir. 2023).

[235] *Compare* 18 U.S.C. § 1956(a)(1)(B)(i) with 18 U.S.C. § 1957(a).

[236] ECF 192 at 19–20.

[237] *Id.* at 19.

[238] *Id.* at 19–20.

[239] *Id.* at 20.

[240] *United States v. Moyer*, 674 F.3d 192, 209 (3d Cir. 2012) (quoting 18 U.S.C. § 1519).

[241] *Id.*

[242] *Id.* at 210.

[243] ECF 194 at 1–2.

[244]*Id.*

[245] ECF 194 at 3.

[246] *See supra* note 224.

[247] *Snyder*, 603 U.S. at 11–12 (emphasis added).

[248] *Id.* at 18.

[249] *Id*. at 18–19.

[250] *Id*. at 19.

[251] *Id*.

[252] ECF 194 at 1.

[253] *See Cordaro v. United States*, 933 F.3d 232, 241 n.4 (3d Cir. 2019) ("[W] we need not resolve whether *McDonnell* in fact applies to § 666."); *see also United States v. Lindberg*, 39 F.4th 151, 165–69 (4th Cir. 2022); *United States v. Roberson*, 998 F.3d 1237, 1245–47 (11th Cir. 2021); *United States v. Ng Lap Seng*, 934 F.3d 110, 131–38 (2d Cir. 2019).

[254] Our colleagues have reached the same conclusion. *See, e.g., United States v. Adams*, 760 F. Supp. 3d 6, 19–21 (S.D.N.Y. 2024); *United States v. Owens*, No. 24-103, 2026 WL 1350787, at *6 (S.D. Miss. May 14, 2026).

[255] 18 U.S.C. §§ 201, 666.

[256] *See generally Synder*, 603 U.S. 11–19.

[257] Trial Tr. 184:7–25, Dec. 10, 2025 (ECF 188).

[258] *See supra* note 227.

[259] *See supra* note 228.

[260] *See generally* ECF 194.

[261] *Id.* at 2–3.

[262] *See generally id.*

[263] *Id.* at 1.

[264] *McDonnell,* 579 U.S. at 572.

[265] *United States v. Lyttle*, 169 F.4th 409, 416 (3d Cir. 2026) (quoting *United States v. Bentz*, 21 F.3d 37, 40 (3d Cir. 1994)).

[266] ECF 194 at 3.

[267] *Id.* at 3–4.

[268] *Id.*

[269] *Id.* at 4.

[270] Fed. R. Crim. P. 12(b)(3)(D) (motion to sever must be raised prior to trial); Fed. R. Crim. P. 12(e) (failure to file motion for severance in advance of trial may constitute waiver).

[271] Trial Tr. 82:11–83:4, Dec. 4, 2025 (ECF 184).

[272] *Id.* 83:5–8.

[273] *United States v. Washington*, 543 F. App'x 171, 175 (3d Cir. 2013).

[274] *United States v. Scarfo*, 41 F.4th 136, 181–82 (3d Cir. 2022), (first quoting *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005); then quoting *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996)), *judgment entered sub nom., United States v. Maxwell*, No. 15-2925, 2023 WL 11282245 (3d Cir. July 17, 2023).

[275] *Scarfo*, 41 F.4th at 182 (quoting *United States v. John-Baptiste*, 747 F.3d 186, 197 (3d Cir. 2014)) (citation modified).

[276] *Id.*

[277] *Id.*

[278] *John-Baptiste*, 747 F.3d at 197; *see also Urban,* 404 F.3d at 776 ("[A] defendant is not entitled to severance merely because the evidence against a co-defendant is more damaging than that against him.") (citation and internal quotation marks omitted); *United States v. Console,* 13 F.3d 641, 655 (3d Cir. 1993) ("Prejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant or some evidence adduced is more damaging to one defendant than others.").

[279] Trial Tr. 163:18–164:2, Dec. 10, 2025 (ECF 188); *see also id.* 164:17–25 ("Questions 1 through 5 ask whether Mr. Martinez is guilty. . . . Questions 4 and 5, we ask whether Ms. O'Neal is also guilty. . . ") 182:18–24 ("[T]he United States must prove beyond a reasonable doubt . . .  Mr. Martinez and Ms. O'Neal were agents of the Virgin Islands, each person is separate. Mr. Martinez as an agent is one question. Ms. O'Neal as an agent.").

[280] *Id.* 164:3–7.

[281] *Scarfo*, 41 F.4th at 182 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

[282] ECF 194 at 4.

[283] Director O'Neal also requests a "severe sanction" based on the allegation the United States "manufacture[d] from whole cloth" the claim she "pressured" an Office of Management and Budget employee to approve Mr. Whitaker's invoices. *Id.* at 3. She argues the allegation appeared in the grand jury proceedings and indictment, but the United States later abandoned it at trial. *Id.* We decline to impose a sanction. Director O'Neal's counsel raised a related concern during trial about the form of the United States' grand jury questioning of Ms. Gaston and argued the prosecutor asked a "litany of leading questions" about whether Ms. Gaston felt pressured. Trial Tr. 244:17–246:16, Dec. 8, 2025 (ECF 186).

We declined to question Ms. Gaston outside the presence of the jury about the grand jury questioning because the issue would become relevant only if she testified inconsistently and the United States sought to impeach her with grand jury testimony. *Id.* 246:17–247:25. We further explained the parties could address the circumstances of the grand jury questioning if impeachment opened the door, recognized counsel's concern about suggested answers, and cautioned the parties to avoid anchoring Ms. Gaston to earlier wording or suggested testimony. *Id.* 248:1–252:16. Director O'Neal identifies no trial testimony or prosecutorial conduct warranting a sanction.